## MANHATTAN RUBBER MFG. CO. v. LUCEY MFG. CO.

(Circuit Court of Appeals, Second Circuit
January 5, 1925.)

No. 252.

**1. Corporations ⬤�longdash556—Equity may appoint receiver for corporation in proceeding by creditor who has no judgment, where corporation does not object.**

Where defendant corporation made no defense to creditors' bill nor to application for receivers, court of equity could appoint receiver and through such receiver take possession of and preserve the corporation's property, though bill was filed by only one creditor and though such creditor has no judgment.

**2. Corporations ⬤⟶555—Court of equity which has appointed receiver cannot order directors to file voluntary bankruptcy petition or admit inability to pay debts and willingness to be adjudicated bankrupt.**

Court of equity which has appointed receiver for corporation has no right to order the directors of the corporation to file a voluntary petition in bankruptcy or to admit in writing the corporation's inability to pay its debts and its willingness to be adjudicated a bankrupt.

Hough, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Bill by the Manhattan Rubber Manufacturing Company against the Lucey Manufacturing Corporation, in which receivers were appointed for defendant. From an order commanding directors of defendant to file a voluntary petition in bankruptcy, or to admit in writing the corporation's inability to pay its debts and its willingness to be adjudicated a bankrupt, defendant appeals. Reversed.

J. J. Lynch, of Chattanooga, Tenn., and E. Bright Wilson, of New York City, for appellant.

Rosenberg & Ball, of New York City (Wilbur L. Ball and Godfrey Goldmark, both of New York City, of counsel), for appellees, receivers.

Before HOUGH and MANTON, Circuit Judges, and LEARNED HAND, District Judge.

MANTON, Circuit Judge. Receivers in equity were appointed for the appellant on August 17, 1923, on a creditors' bill filed in the District Court. The bill of complaint alleged that the appellant was indebted to the complainant in upwards of $3,000 and that it owed other sums to creditors in ex-

cess of $2,015,000. It alleged that it had assets more than sufficient to meet its obligations and was solvent but temporarily financially embarrassed. Further, it alleged that in order to preserve its property for equitable distribution among those entitled thereto, it believed the District Court should intervene and appoint a receiver to take charge of all the assets of the defendant, which receiver should conduct, maintain, and administer the same under the power to be conferred upon him in the proposed decree which was submitted upon the filing of the complaint. In the prayer for relief, an injunction was asked, restraining creditors from proceeding to collect the obligations owed by the appellant. An answer was filed admitting the allegations of the bill, and the decree was entered on consent appointing the receivers. The corporation had property in California, but no receivers were applied for or appointed in either an ancillary or original bill in that jurisdiction.

On October 6, 1924, the receivers appointed filed a petition asking for an order that the corporation should voluntarily take action necessary to cause it to be adjudicated a bankrupt. The petition alleged that the corporation was insolvent; that the receivers had asked the defendant, its officers and directors, to voluntarily file a petition in bankruptcy or consent to the adjudication of the corporation as a bankrupt, and this request had been refused. It set forth that a meeting of the directors was called for and that the directors had consistently refused to cause the defendant to take such action. It alleges that one J. F. Lucey owns the majority of the stock of the corporation, and that he selected the majority of the directors and controls them; that he has refused to permit the directors to file a petition in bankruptcy for the reason that he would be personally liable for indebtedness owing in California, since such liability is imposed upon stockholders under the law of that state. It sets forth that a creditor in California has attached the property of the corporation in that jurisdiction for a large indebtedness, and the property so attached is valued at $550,000, with a realizable value of from $200,000 to $300,000.

Upon hearing this application, the District Court entered an order which commanded that the corporation should admit in writing its inability to pay its debts and its willingness to be adjudicated a bankrupt on the ground that it is insolvent. And it was further ordered "that each and every officer and director of the defendant authorized to act by such resolution, shall without delay, act in accordance therewith." The theory of such proceedings was to avoid the creditors in California securing the advantage they had by their writ of attachment and to cause the property in that state to come under the jurisdiction of the bankruptcy court for administration. Indeed, all the property of the corporation would at once be transferred to the bankruptcy court.

[1] To this creditors' bill the corporation made no defense, nor to the application for receivers, through its duly constituted authority to give consent by admissions of the allegations of the complaint. Therefore, the administration of the assets of this corporation is within the function of this court of equity and the parties are before the court. It has the power to proceed with such administration. Under the creditors' bill, courts of equity have lent their assistance to common-law courts to enable judgment creditors to reach, through receivers, property beyond the reach of execution. The scope of these suits has extended into equitable levies in favor of all judgment creditors entitled to seize the defendant's property. No distinction is drawn between corporations and individuals. Now the practice has been established of permitting creditors having judgments to apply to courts of equity to take possession of the assets and undertake, through receivers, their general administration. And now the judgment creditor is not essential unless the corporation objects. A creditor may file a bill, and if the corporation does not object, but consents, the court of equity may appoint the receiver, and through such officers the court will have the same general administration. Penn. Steel Co. v. N. Y. City Railway Co., 198 F. 721, 117 C. C. A. 503; Graselli Chemical Co. v. Ætna Explosives Co., 252 F. 456, 164 C. C. A. 380. The purpose of this creditors' bill, like all such bills, whether brought by one creditor or for the benefit of all the creditors, has for its primary purpose securing equality of distribution of assets. The chief purpose of such a bill is to gather in and preserve its assets. As to the extent and method of administration, we have said in the Ætna Case, supra:

"The court possesses jurisdiction over the corporation, as well as over the property of the corporation, and it has complete power to deal with either, and it is essential that it should have, for it could not control the property without the power to control the corporation. The appointment of the receiver supersedes the power of the directors

to carry on the business of the corporation, and the receivers take possession of the corporation, its books, its records, and assets. Indeed, it is often the custom for courts of equity, in an order appointing the receiver, to expressly restrain the corporation and its officers from exercising any of the privileges or franchises of the corporation until the further order of the court. The court's power to take from the directors their right to direct can also, while in control, restrain action by the stockholders, when it deems it for the best interests of all concerned to do so."

It is argued by the appellee that our decision in the Ætna Case is authority for the order appealed from. That was a receivership in equity on a creditor's bill. The amended certificate of incorporation of the defendant provided that the preferred stock had no voting rights except in the event that there should be a default in the payment of dividends on the preferred stock for a period of eight months. Then it was provided that each share of the preferred stock should have nine votes. During the pendency of the equity receivership, eight months elapsed without the payment of dividends upon the preferred stock. The annual meeting of the stockholders was appointed to be held on March 19, 1918, and it appears that there was to be a contest for the control of the board of directors to be elected at that meeting. A plan of reorganization was under consideration. The stockholders were enjoined from holding a meeting because the court found that it would be inequitable to permit the preferred stock, under the circumstances, to exert the voting rights with the prospect of interference with the plan of reorganization. In supporting the order there entered, we considered the extent to which a court might interfere with the internal affairs of the corporation in aid of the proper fulfillment of the purposes of the suit. All that was done in that case was to preserve the res, keep it within the jurisdiction of the court, and assist a plan of reorganization. It enjoined prospective interference with such purposes.

Here the court commands the directors to, in effect, end the success of this suit, and, indeed, makes it valueless. It purposes to turn over to the bankruptcy court all the assets. It defeats the plea to protect against creditors temporarily and to enable the corporation to restore itself to the position to meet its obligations due to creditors.

In Gay v. Hudson River Electric Power Co., 184 F. 689, 106 C. C. A. 643, the corporation was in equity receivership. A mortgagee under a mortgage existing prior to the receivership, was restrained, by the order appointing the receivers, from foreclosing its mortgage. An application to vacate the injunction as to it was denied, and on appeal this court reversed the order holding that the mortgagor might proceed with the foreclosure, and we said:

"But, although a court of equity will be astute to protect all equitable interests, there is a limit beyond which it may not go. In the case of successive mortgages upon a single piece of real estate, it may often be a great hardship to the holder of a junior mortgage to have the property sold under foreclosure of the first mortgage at a time when general financial distress will preclude any hope of enough being realized to pay more than the amount secured under the first mortgage, while, if all action could be suspended for two or three years, the property would sell for a price sufficient to pay both mortgages in full. But there is no power in a court of equity to abrogate the right of foreclosure and sale for which the first creditor stipulated, which is incorporated in the contract and on the strength of which he lent his money. * * * It may be a 'grievous wrong' to them to permit such sales; but, if it is the clear right of the mortgagee to have such a sale go on, the court may not deny him his right, however great may be the hardship to others."

In Odell v. H. Batterman Co., 223 F. 292, 138 C. C. A. 534, the defendant was in equity receivership, and the landlord of the premises of which the defendant had a lease applied to the court for permission to commence an ejectment action in the state court. It was held to be an abuse of discretion to refuse to permit the landlord to adjudicate his claim, even though it resulted in dispossessing the corporation.

In Oliver v. Parlin Co., 105 F. 272, 45 C. C. A. 200, in a suit in equity to recover possession of real property and to cancel a deed of trust executed by prior owners thereof for fraud in which the grantors and grantees of such deeds were made defendants, the court of equity, where the defendant was in equity receivership, refused to restrain the foreclosure proceedings in the state court.

These cases illustrate the limitations that are imposed upon the equity court in the administration of the corporation's affairs. It is the bankruptcy court that must determine whether the defendant should be adjudicated a bankrupt under the Bankruptcy Act (Comp. St. §§ 9585–9656). The ap-

pellant has a right to a trial by jury on the issues of insolvency and the commission of the act of bankruptcy on such application for adjudication. This right must not be denied. C. Elliot v. Toeppner, 187 U. S. 327, 23 S. Ct. 133, 47 L. Ed. 200. Here the bill and answer agreed that the assets are sufficient to pay all its indebtedness. No solvent corporation can be adjudged a bankrupt without its consent. It must be a voluntary act of the board of directors, or a creditor may show the commission of an act of bankruptcy. The present effort is to compel its officers, without their consent and, indeed, over the protest of some of the board of directors, and without an application of a creditor, to allege or admit insolvency so that the bankruptcy court may take possession and jurisdiction of the res collected and maintained by this court of equity. The hope is to defeat the attachment of property of the corporation in California. This effort resulting in this order is wholly beyond the court's power to command. The directors have the privilege of placing the corporation in bankruptcy if they so desire—if the business necessities require it. The failure to go into bankruptcy is not a legal wrong.

In Wilson v. City Bank, 84 U. S. (17 Wall.) 473, 21 L. Ed. 723, the Supreme Court said:

"As before remarked, the voluntary clause is wholly voluntary. [Bankruptcy Act.] No intimation is given that the bankrupt must file a petition under any circumstances. While his right to do so is without any other limit than his own sworn averment that he is unable to pay all his debts, there is not a word from which we can infer any legal obligation on him to do so. Such an obligation would take from the right the character of a privilege, and confer on it that of a burdensome and, often, ruinous duty.

"It is, in its essence, involuntary bankruptcy. But the initiation in this kind of bankruptcy is, by the statute, given to the creditor, and is not imposed on the debtor. And it is only given to the creditor in a limited class of cases."

See, also, Summers v. Abbott, 122 F. 38, 58 C. C. A. 352; Richmond Steel Co. v. Allen, 148 F. 657, 78 C. C. A. 389; In re New Amsterdam Motor Co. (D. C.) 180 F. 943.

[2] The debtor is under no obligation to proceed voluntarily into bankruptcy. He cannot be forced to bring such a proceeding. Even in an involuntary proceeding, his failure to appear does not convert the proceeding into a voluntary one. Creditors have the right, if cause be shown under the Bankruptcy Act, to file a petition. No greater rights are accorded receivers. A court of equity cannot add to the bankruptcy statute any more than it can take from the mortgagee his right to foreclose his lien or the owner his right to possession if entitled thereto before the receivers took possession of the res. This leaves the right of creditors to proceed under the Bankruptcy Act unimpaired if good cause be shown. We think the command of the order below reaches out into limits that a court of equity may not go in administering the property of the corporation in possession of its receiver. The case is not in conflict with the authority of the Ætna Case upon which the appellee relies. There is a clear distinction.

Order reversed.

LEARNED HAND, District Judge (concurring). The right of the District Court to entertain such a bill as that at bar depends upon the jurisdiction of a court of equity over a judgment creditor's bill; it is that and nothing more. Pusey & Jones v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763. True, it is not necessary that the debt shall be in judgment and that execution shall be returned nulla bona, if the defendant consent (Re Metropolitan Street Railway Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403), but that in no sense changes the equity of the bill, any more than the fact that it is brought on behalf of all creditors instead of on behalf of one. In such a suit the court takes possession of the property, and sells and distributes it; but in so doing it acts strictly in rem and does not go beyond the reach of its process. This remains true although the court acting in personam may compel the debtor to convey assets which it cannot seize (Ager v. Murray, 105 U. S. 126, 26 L. Ed. 942), or which may be without the jurisdiction (Bailey v. Ryder, 10 N. Y. 363, 370), just as it may in a foreclosure (Muller v. Dows, 94 U. S. 444, 24 L. Ed. 207). Yet the scope of the bill still remains a distribution of the assets which can be brought within its jurisdiction, in payment of the defendant's debts.

In the suit at bar the order under appeal requires the defendant to commit an act of bankruptcy and to consent to file a voluntary petition, either of which will defeat the very purpose of the bill by compelling a surrender by the receivers to the bankruptcy court which supersedes all other insolvency proceedings. I cannot conceive how that can be thought to be within the purposes of the

suit to which the defendant consented, and I submit that it is entitled to insist upon limiting that consent to what the bill proposed.

As I understand it, the receivers support their position chiefly by an appeal to Graselli Chemical Co. v. Ætna Explosives Co., 252 F. 456 (C. C. A. 2) 164 C. C. A. 380. There it is true that by a divided court we held in a suit like this the preferred shareholders of a company in receivership might be enjoined from exercising rights given them under the charter. If the principles there enunciated were again to arise, for myself, I should feel it necessary to give the closest scrutiny to their validity and to consider in the gravest possible way whether the authority of the case must not be confined to the very facts then before the court. For that reason I am quite unwilling now by silence to give any apparent assent to its broader implications. However, I entirely agree with my brother MANTON in thinking that even if Graselli Chemical Co. v. Ætna Explosives Co., supra, should in the end become broadly accepted, the case at bar is certainly beyond its ruling. At least the court did not there in effect terminate the suit itself; its action, proper or not, was confessedly ancillary, and was supported only on the theory that it made possible the distribution of the assets in the suit itself.

The receivers' argument goes even further. We are asked to hold that such a suit submits the corporation generally to a visitatorial control, by virtue of which we can compel the debtor to do whatever may in our judgment be to the advantage of its creditors. Any such notion ignores altogether the origin and history of such suits. They are as much limited by law as any others, and there is in my judgment no warrant either in principle or policy for asserting that, once a receiver is appointed, the court takes on the part of a benevolent despot. If we needed authority for so plain a proposition, it seems to me that there is the clearest intimation of it in Pusey & Jones v. Hanssen, supra.

HOUGH, Circuit Judge (dissenting). Something might be said concerning the order complained of as an act of discretion; that is, whether it was advisable to make such an order. But I am not concerned with that, because what is here attacked is the jurisdiction of the court to make the order, for this court is declaring that the order in question was beyond the power of the District Court, and on this point I cannot agree.

The case at bar presents a typical "umbrella receivership"; by which is meant that a court of equity has extended its protection to a defendant which admitted that it was unable to discharge its obligations as they matured, but agreed that if well managed and granted a moratorium it had enough property to pay what it owed—and indeed do better than that. When such an application is made, the proper question (not I think always asked) is whether the "hardship and impossibility of other relief justify the appointment."

I am sure that few suits of this kind were ever begun against corporations other than carriers where the suggestion of ultimate solvency or better was not somewhat hazardous. At all events, corporations whose solvency was thus averred in limine have so often turned out grossly insolvent that creditors' bills of this nature have by a process of evolution become an elaborate scheme of insolvent administration or corporate reorganization according to the turn of events after receivers appointed.

Indeed, such bills have come to afford a species of locus poenitentiæ for the study of possibilities by creditors, shareholders, directors, receivers, and various self-appointed committees sitting under the chancellor's "umbrella" and watching the weather outside.

I think it true that the origin of such bills was the willingness of equity to lend its aid by way of equitable levy to an effort equally to distribute assets whether sufficient or insufficient for solvency among those legally entitled thereto. Thus the primitive view of a bill like this one led to regarding it as no more than the reduction to the court's possession of a certain amount of property and to confining the activities of chancery to the preservation, distribution, or restoration of that property to or among the persons entitled to the same.

But no one was ever able to know beforehand the ramifications of such a matter, or to foresee the demands that would be made upon the discretion, the boldness, or the inventive ability of the court whose aid creditors, shareholders, and directors united in seeking. And this has been shown increasingly true in a federal Union like ours, where each of the 48 constituent sovereigns often seems primarily engaged in playing for its own hand, and does this in a business world rendered more complex by the structure of our country and increasingly impatient with the hampering limitation of state lines and state laws. Such conditions,

political and commercial, are increasingly presenting new and vexatious questions loudly calling for what one of our ablest judges has called "the plastic remedies of equity."

Such a situation was acutely presented to this court in Graselli, etc., Co. v. Ætna, etc., Co., 252 F. 456, 164 C. C. A. 380. That well-known decision was necessarily one of two things—there was no tertium quid. It was either a rather bald legal mistake, or it was an advance, ingenious and even daring, in equity jurisdiction—and I use the word "jurisdiction" in its primary sense as meaning power. It was made after exhaustive argument by counsel of learning, and the result was of primary importance if equitable proceedings for reorganizations or in insolvency are to continue and to grow, as all living things must grow. Therefore as I regard that decision as a marked advance in jurisprudence, and not as a mistake, I think that its implications should be now lived up to—as they should have been recognized when the decision was formulated.

The central thought of that judgment is that the modern creditors' bill is much more than an equitable levy upon such property as might pass into the hands of the receivers appointed under the bill; and it was an advance because the defendant was held personally or individually subject to the jurisdiction, that is, to the power of the chancellor, and so far subject thereto that the corporation or its officers might ·be restrained from exercising their privileges or franchises, and even the stockholders might be restrained from acting as stockholders are lawfully entitled to do whenever their intended action was in the opinion of the court not for the best interests of all concerned. There is plainly no difference in legal theory between injunctions forbidding ·an act and injunctions commanding an act, and either may be used to further the common interest of all parties in the res, i. e., the property of the defendant.

In practical administration under creditors' bills like this, the Ætna decision had been for some time foreshadowed. Thus officers and directors of a defendant corporation have been ordered to execute deeds of corporate realty in order that all concerned might benefit by the price obtained therefor; and similarly such officers have been compelled by order to convey the title of corporate realty to the receivers of the court in order to facilitate dealing with the same and inter alia preventing attachments being laid on lands situate in states to which the corporate defendant was foreign.

To prevent corporate officials and shareholders from improperly dealing with corporate property and to compel them properly to deal with it in ways that receivers for well-known reasons cannot do, is but one method of administering the res in the court's possession. Any corporate act which injures that res is an interference therewith, and that this was the sense, or one sense, of the Ætna decision has ·been stated by this court in Habirshaw, etc., Co. v. Habirshaw (C. C. A.) 296 F. 875, at 880.

And in Re O'Gara Coal Co., 260 F. 742, at 744, 171 C. C. A. 480, the Ætna decision has been cited as not interfering in any way with the corporate existence of the defendant or as denying the right of the stockholders to act "in cases where the court fails or refuses to exercise its supervisory power."

The case last cited was in bankruptcy, and it emphasizes the truth that in bankruptcy no more than in equity is the corporate existence interfered with or the legal relations of directors and shareholders impaired. This is elementary, but the novelty of the Ætna Case is that it recognized and approved the supervisory power of the equity court as something that could coerce corporate action for the benefit of all concerned. But it is now asserted to be beyond the power of the equity court to compel the defendant herein to go into bankruptcy.

In a strict sense, the order requires nothing of the kind; it only directed the defendant to tell the truth as to its financial condition, and to add thereunto the statement that it was willing to be adjudged a bankrupt. A majority in value of the shareholders were not willing so to have the corporation adjudicated, and their unwillingness on this record was due to another willingness, viz.: They preferred to have a few creditors absorb all the California assets of the estate rather than to expose themselves to possible personal liability under the corporation laws of the same state. The motive or reason was most unworthy, it was plainly not for the benefit of all concerned, and a plainer case for the exercise of supervisory power could hardly be presented—if ·the situation was worth saving at all—but this last hypothesis cannot be considered on the question of power, for it goes only to the matter of discretion. But it is further argued that there is some difference between forbidding shareholders to vote and telling directors to go into bankruptcy, because no one can be compelled to seek the bankruptcy court; every debtor has his right of choice until involuntary proceedings have been perfected

against him. And it is said that to coerce or forbid this right of choice is the deprivation of a lawful right.

No more lawful right could be imagined than the right of the Ætna stockholders to vote; it was an inherent part of the charter of the corporation, and if the chancery court could deprive them of that right it was a far more drastic exercise of power than to compel a body of directors to tell the truth about their corporate condition.

Further, bankruptcy is not legal suicide, and there is much to be said in favor of a properly conducted bankruptcy as a scheme of reorganization, and only in bankruptcy can the still surviving and unimpaired corporation obtain a discharge from its debts. Viewed as an alleged violation of legal right the order here complained of seems to me far less drastic than that in the Ætna Case.

But it is further argued (if I understand it) that there is something radically wrong in issuing an order in equity the effect of which will probably be to terminate or render idle the very suit in which the order is entered. Suits are not virtuous in themselves; the object of any suit of this kind is to secure equitable equality for all and if that result can be reached by inviting or by ordering the suitors to seek another jurisdiction, it seems to me a rather archaic view to make a sort of fetish out of the suit first brought. There is nothing sacred about this equity suit. If it can attain its object of equitable equality by any other method than a final judgment, it is for the good of all concerned that it should be done.

It follows that I must dissent, because I feel very strongly that the court is refusing to follow the Ætna Case, while not in terms overruling it.